**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **IN RE FOUNDRY RESINS**<br>**ANTITRUST LITIGATION** | **Case No.**          **2:04-md-1638**<br>**Master Docket No.**    **2:04-cv-415** |

**JUDGE GREGORY L. FROST
Magistrate Judge Mark R. Abel**

**This document relates to:**
<u>**ALL CASES**</u> **except 2:04-cv-1165.**

<u>**OPINION AND ORDER**</u>

This matter is before the Court for consideration of Plaintiffs' June 30, 2006 Motion for

Class Certification and Appointment of Class Counsel (Doc. # 165), Defendants' February 23,

2007 Motion to Strike Report and Exclude Testimony of Plaintiffs' Class Expert (Doc. # 202),

and Plaintiffs' February 28, 2007 Motion to Strike Defendants' Motion to Strike Report and

Exclude Testimony of Plaintiffs' Class Expert (Doc. # 207).  For the reasons that follow, this

Court **DENIES AS MOOT** Plaintiffs' motion to strike (Doc. # 207), **DENIES** Defendants'

motion to strike (Doc. # 202), **GRANTS** Plaintiffs' certification motion (Doc. # 165), and

**ORDERS** the certification of the proposed class as modified in the reply memorandum, as well

as the requested certification of class representatives and appointment of class counsel.

**I.  Background**

This multi-district litigation involves a purported antitrust conspiracy in which Defendant

Hüttenes-Albertus Chemische Werke GmbH ("HA") allegedly conspired with various domestic

companies to fix prices and competition in the foundry industry.  The named plaintiffs, a group

1

of resin purchasers, contend that within a few years after its 1998 entry into the United States foundry resins market by forming Delta-HA, HA met with its chief domestic competitors, Defendants Borden Chemical, Incorporated ("Borden") and Ashland Incorporated ("Ashland"), in various countries.

Plaintiffs contend that one such meeting occurred in the Dominican Republic in late 2000 or early 2001. This meeting allegedly culminated in a 2001 merger or joint venture between HA and Borden creating HA International LLC ("HAI"). Another meeting between HA, Borden, and Ashland representatives[1] took place in Germany, and various company representatives also met later in Paris. In these and subsequent meetings summarized in Plaintiffs' detailed filings, including meetings in Columbus, Ohio in 2002, Defendants allegedly worked to eliminate competing against one another, to allocate the American and European markets among the specific companies, and to fix the prices of foundry resins.

The purported end results of Defendants' agreements were that the defendant companies did not compete against one another, even going so far as to issue non-competitive bids containing inflated quotes to avoid obtaining the other's customers,[2] and that they joined in issuing coordinated price announcements. The realized overall goal, according to Plaintiffs, was that the conspiracy participants obtained profit increases by controlling pricing (by setting

---

[1] The principal attendees at the various meetings appear to have been Klaus Pampel of HA, Keith McLean of Borden, and Mike Killian and Mike Swartzlander of Ashland. Allegedly also in attendance at various meetings were HAI's Keith McClane and Ashland's Gary Strehl, Rick Smith, Rick Parker, Alex Otte, Ken Sadowski, and John Hart.

[2] Plaintiffs assert that the conspiracy existed from at least January 1, 2001 through December 31, 2003. They have submitted evidence that after refusing to bid for business from Ashland's customers during this period, HAI has bid for such business since 2004.

2

conspiratorial minimum baselines or starting points for pricing) and not by soliciting new business from the other alleged conspiracy participants' customers.

Plaintiffs have submitted documentary evidence arguably supporting these allegations. A May 24, 2002 e-mail from HAI employee John Hart expressly indicated an intent to avoid poaching, or obtaining the business of, Ashland customers and advocated using "competitive intelligence" to quote inflated prices to ensure this result.

Two other documents, a September 13, 2001 internal Ashland memorandum produced in discovery and an affidavit from former Ashland employee Gary Strehl, indicate an intent to falsely attribute price increases to increased raw material costs. The memorandum states that although Ashland employee Rick Smith thought that the company would avoid a raw material price increase, he would like the industry to believe that Ashland did incur the increase because it would provide an opportunity to raise prices in the marketplace. The Strehl affidavit echoes HAI's similar reliance on false attribution of price increase causation and notes that even when their product formulations were not the same, Ashland made identical price increases when HAI raised its prices based on purported raw material cost increases.

According to other affidavit evidence submitted by Plaintiffs, former HAI salesman Todd Williams was ordered not to bid for an Ashland customer's business at a price quote less than Ashland's prices. He also indicates that the margins he was told to use were inflated so as to avoid securing business. When Williams violated that prohibition, handwritten notes on the price quote and a monthly report indicate that HAI voided the contract to prevent securing the

business of the Ashland customer.[3]

Plaintiffs also point to circumstantial evidence such as Ashland announcing or memorializing periodic foundry resins price increases during the period of 2001 through 2003, followed by consequent HAI pricing modifications.  Similar allegations pertain to furan resins price increases.  Plaintiffs contend that these price lists involved inflating prices through mutual increases and/or controlled decreases, with the result being artificially controlled baseline pricing pervading even negotiated pricing for individual customers.  The theory is that just as elevating the water level raises all ships, manipulating the baseline minimums through increases or controlled decreases artificially elevates all pricing purchasing agreements with all customers, even though select customers might end up paying different amounts.  The loss of actual competition influences the marketplace, which ceases to afford purchasers the benefit of genuine competitive pricing.

Based on this rationale, the various plaintiffs filed numerous antitrust actions throughout the country asserting horizontal price-fixing and market-allocation conspiracies.  The Judicial Panel on Multidistrict Litigation transferred these cases to this Court (Doc. # 1), and the Court then consolidated the cases under the captioned cause (Doc. # 2) and appointed interim lead co-counsel and liaison counsel (Doc. # 25).  A period of various procedural and pleading activity followed.  HA eventually moved for dismissal on the grounds that there was a lack of personal jurisdiction.  (Doc. # 43.)  After a period of related discovery and completion of the parties' briefing on the jurisdictional issue, the Court denied the motion to dismiss. (Doc. # 138.)

---

[3] The handwritten note indicates that "R. Parker"–presumably Ashland's Rick Parker–was requesting a copy of the quote after receiving word from Klaus Pampel that HAI had quoted below Ashland.

4

Another period of discovery followed, with the parties focusing on the issue of class certification.  Plaintiffs subsequently moved to certify a class and to appoint class counsel.  (Doc. # 165.)  Defendants opposed this motion and filed a motion to strike the report of and to exclude testimony by Plaintiffs' expert, Dr. John C. Beyer.  (Doc. # 202.)  Plaintiffs responded by filing a motion to strike Defendants' motion to strike.  (Doc. # 207.)  The parties completed their briefing, and the Court entertained oral argument on all three motions on March 20, 2007.  The motions are therefore ripe for disposition.

## II.  Motions to Strike

In support of their class certification motion, Plaintiffs have offered a report from their class expert, John Beyer.  Through bloated briefing, Defendants move to strike the affidavit and to exclude Beyer from testifying on the grounds that because the evidence before the Court contradicts his opinions on impact and damages, his opinions fail to qualify as admissible expert testimony.  (Doc. # 202.) The crux of Defendants' argument is that Beyer has relied on gross over-generalizations while ignoring the realities of what customers actually paid and how the foundry resins market actually works.

Through equally obese briefing, Plaintiffs dispute these contentions and seek in turn to strike Defendants' motion to strike.  (Doc. # 207.)  Plaintiffs argue that Defendants ask the Court to apply an inappropriate standard to evaluate Beyer's work and that Defendants are essentially premature in presenting their arguments.  While defending Beyer's opinions, Plaintiffs also ask this Court to strike Defendants' motion to strike on the grounds that Defendants have filed an improper sur-reply on the merits under the guise of a motion.

The Court shall address first Plaintiffs' motion to strike.  To be certain, there is some

5

basis for characterizing Defendants' motion as a sur-reply filed in contravention of the local

rules and this Court's orders.  Despite its caption, Defendants' motion does often target–arguably

predominately targets–the merits of the class certification dispute.  And the Court is cognizant

that addressing the potential striking of Defendants' motion should logically precede any

substantive consideration of that motion.  But given the Court's disposition of Defendants'

motion, it simply does not matter to Plaintiffs' case whether the Court technically strikes the

motion or denies it.  The Court therefore **DENIES AS MOOT** Plaintiffs' motion to strike.  (Doc.

# 207.)

Turning to Defendants' motion to strike, the Court notes that Defendants rely on *Daubert*

*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  In *Daubert*, the United States

Supreme Court held that the Federal Rules of Evidence had superseded the "general acceptance"

test of *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), and that Rule 702 requires that trial

judges perform a "gate-keeping role" when considering the admissibility of expert testimony.

*Daubert,* 509 U.S. at 597.  The relevant Federal Rule of Evidence is Rule 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier
> of fact to understand the evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, skill, experience, training, or education, may
> testify thereto in the form of an opinion or otherwise, if (1) the testimony is based
> upon sufficient facts or data, (2) the testimony is the product of reliable principles
> and methods, and (3) the witness has applied the principles and methods reliably
> to the facts of the case.

Fed. R. Evid. 702.  Further, the Supreme Court has made clear that Rule 702 applies not only to

scientific testimony but also to other types of expert testimony based on technical or other

specialized knowledge.  *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147, 149 (1999).

6

Assuming for the moment that *Daubert* and Rule 702 apply with full force here–a doubtful proposition–the Court recognizes that its gate-keeping role is two-fold.  First, the Court must determine whether the proffered testimony is reliable.  *See Daubert*, 509 U.S. at 590.  The reliability assessment focuses on whether the reasoning or methodology underlying the testimony is scientifically valid.  *Id.*  The expert's testimony must be grounded in the methods and procedures of science and must be more than unsupported speculation or subjective belief.  *Id.*  Thus, the proponent of the testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable.  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994).

The Supreme Court in *Daubert* set out four non-exclusive factors to aid in the determination of whether an expert's methodology is reliable.  They are:

> (1) whether the theory or technique has been tested;
> (2) whether the theory or technique has been subjected to peer review and publication;
> (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and
> (4) whether the theory or method has been generally accepted by the scientific community.

*Daubert*, 509 U.S. at 593-94.  *See also Deal v. Hamilton County Bd. of Ed.*, 392 F.3d 840, 851 (6th Cir. 2004).  The Court in *Kumho Tire* stressed that, in assessing the reliability of expert testimony, whether scientific or otherwise, the trial judge may consider one or more of the *Daubert* factors when doing so will help determine that expert's reliability.  *Kumho Tire*, 526 U.S. at 150.  The test of reliability is a "flexible" one, however, and the four *Daubert* factors do not constitute a "definitive checklist or test" but must be tailored to the facts of the particular

case.  *Id.* (quoting *Daubert,* 509 U.S. at 593.)  *See also Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 470 (6th Cir. 2004).  The particular factors will depend upon the unique circumstances of the expert testimony involved.  *See Kumho Tire Co.*, 526 U.S. at 151-52.

The second prong of the gate-keeping role requires an analysis of whether the expert's reasoning or methodology can be properly applied to the facts at issue, that is, whether the opinion is relevant to the facts at issue.  *See Daubert*, 509 U.S. at 591-93.  This relevance requirement ensures that there is a "fit" between the testimony and the issue to be resolved by the trial.  *See United States v. Bonds*, 12 F.3d 540, 555 (6th Cir. 1993).  Thus, an expert's testimony is admissible under Rule 702 if it is predicated upon a reliable foundation and is relevant.

The United States Supreme Court and other Circuit Courts of Appeal have made clear that a person, although qualified as an expert in one area of expertise, may be precluded from offering opinions beyond that area of expertise or that are not founded on a reliable methodology.  *See, e.g., Kumho Tire Co., Ltd.*, 526 U.S. at 154-55 (finding the proffered expert qualified as an expert in mechanical engineering, but that his methodology in analyzing a particular tire failure was not reliable); *Weisgram v. Marley Co.*, 169 F.3d 514, 518 (8th Cir. 1999) (holding that a city fire captain, although qualified as an expert on fire investigation, and therefore qualified to testify as to his opinion that a fire started in the entryway and radiated to a sofa, was not qualified to testify as to his unsubstantiated theories of a malfunction that might have caused the fire); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1317-19 (11th Cir. 1999) (proposed expert testimony of pathologist not permitted upon basis of unreliable methodologies in silicon breast implant case); *Cummins v. Lyle Indus.*, 93 F.3d 362, 371 (7th Cir. 1996)

(industrial engineer not permitted to render an expert opinion regarding the adequacy of warnings, the adequacy of an instruction manual, and the feasibility of alternative designs for a trim press).

The gatekeeper role, however, is not intended to supplant the adversary system or the role of the jury; rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. The judge's role is simply to keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value. *Wellman v. Norfolk and Western Ry. Co.*, 98 F. Supp. 2d 919, 923-24 (S.D. Ohio 2000).

Thus, even assuming arguendo that *Daubert* applies to some degree at this class certification stage of the proceedings,[4] the Court, exercising the considerable leeway associated with a *Daubert* inquiry, disagrees with Defendants' basis for striking Beyer's report and testimony. *See Meridia Prods. Liab. Litig. v. Abbott Labs.*, 447 F.3d 861, 868 (6th Cir. 2006) (citing *Kumho Tire Co.*, 526 U.S. at 152) ("the district court has 'considerable leeway' in making

---

[4] Given the Court's decision considering the *Daubert* factors, the Court need not and does not definitely opine on Plaintiff's argument that they apply, if at all, with lesser force in class certification proceedings. The Court does note, however, that the substantial body of case law cited by Plaintiffs as standing for the proposition that *Daubert* does not control in this context. *See* Doc. # 210, at 10-11 (collecting cases); *see, e.g.*, *Bert v. AK Steel Corp.*, No. 1:02-CV-00467, 2006 WL 1071872, at *7 (S.D. Ohio Apr. 24, 2006) ("In ruling on Plaintiffs' class certification motion, the Court need not determine whether or not Dr. Bradley's opinion can survive a *Daubert* challenge"). The Court also notes that at least one trial court in the Sixth Circuit has apparently conducted a *Daubert* inquiry prior to a class certification determination. *See In re Delta Air Lines*, 310 F.3d 953, 955 (6th Cir. 2002) (noting that the district court held a *Daubert* hearing followed by a class certification decision, but explaining that a merits analysis is not appropriate for a certification analysis).

these sorts of [*Daubert*] determination"). Despite Defendants' contrary argument, there are

cognizable bases for the methodologies Beyer employs. As Plaintiffs note, other courts have

also recognized consistent analyses and methodologies, and it is irrelevant here that Beyer's

reliable approach may indeed have significant weaknesses. *See In re Scrap Metal Antitrust

Litig.*, No. 1:02 CV 0844, 2006 WL 2850453, at *12 (N.D. Ohio Sept. 30, 2006).

Defendants' arguments essentially target the merits or sufficiency of the evidence upon

which Beyer relies. For example, the parties expend considerable energy debating Beyer's

analysis of the market. But this is not the time for a battle of inferences. Resolution of the

nuances of this merits debate is not appropriate at the class certification stage. The Sixth Circuit

has echoed this limited approach in discussing an appeal of a certification order:

> [M]uch of the defendants' argument with respect to the class certification
> decision arises from their disagreement with the district court's earlier rulings on
> the motions to dismiss and for summary judgment. They argue that the district
> court erroneously relied upon the plaintiffs' characterization of the relevant
> markets as hub-based rather than treating the monopoly as involving 234 distinct
> city-pair routes. This difference, they say, cuts against the showings of
> commonality and typicality necessary to certify a class. However, the district
> court's characterization of the markets this way in the class certification decision
> is closely tied to its decision not to weigh, at this stage of the litigation, the
> conflicting opinions of the experts. In certifying the class, the court accepted the
> notion of subclasses and left open for future consideration whether there is a
> plaintiff class representative for travelers from each and every hub.

*In re Delta Air Lines*, 310 F.3d at 961. Thus, the appellate court declined to delve into a merits

inquiry on appeal. *Id.* ("An interlocutory review of the class certification decision will entangle

the merits of the case, which involve the characterization of the monopoly and relevant markets,

with the more routine consideration of class certification factors, which involve commonality

and typicality. We are not inclined to extend the jurisdiction conferred by Rule 23(f) in this

direction.").

The questions Defendants pose–and they are not all bad questions–therefore go more to the weight of the evidence and interpretations than they do to the admissibility of this material. The arguments often conflate threshold admissibility with more substantive analysis of issues of commonality and predominance. But this Court's rigorous analysis of the Rule 23 requirements below subsumes many of the grounds for striking Beyer's work–and the following inquiry therefore arguably moots the motion to strike.[5] Moreover, the correctness of the contested facts underlying Beyer's analysis is a jury question. *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003). Thus, as discussed more fully below in the substantive merits portion of this decision, the evidence upon which Beyer relies (and which he often better explains in his post-motion to strike affidavit, Doc. # 211) presents a sufficient basis for admissibility and consideration *at this time* and *at this stage* of the litigation, where the Court is concerned with whether the record presents an adequate basis for class certification.

This is not to say that Plaintiffs will ultimately prevail in this litigation, that the Court agrees with every method Beyer employs or every conclusion and interpretation he reaches, or even that Defendants will fail to persuade this Court to come to a contrary conclusion later in these proceedings. Rather, the Court simply recognizes today that there is a sufficient methodology behind Beyer's various approaches and a perhaps *just*-adequate factual basis behind his work. The Court also recognizes that Defendants have prematurely often sought to

---

[5] To defend their motion to strike, Defendants direct this Court to *Rodney v. Northwest Airlines, Inc.*, 146 F. App'x 783 (6th Cir. 2005). Defendants are correct that the district court in that case rejected an experts' opinions and denied certification. The *Rodney* trial court did that in the context of examining whether common issues of law and fact would predominate *as part of* its certification inquiry, however, and *not* within the context of a pre-certification analysis motion to strike based on admissibility. Thus, contrary to Defendants' briefing, Defendants did not bring their motion to exclude in the instant case "[a]s in *Rodney*." (Doc. # 209, at 3.)

introduce merits arguments under the guise of admissibility issues.

The Court's role at this stage is not to decide the merits, but to ascertain whether class certification is appropriate.  That latter consideration looks at substantive arguments and whether evidence exists targeting key areas of inquiry, but does not involve resolving merits disputes. Accordingly, the Court **DENIES** Defendants' motion to strike.  (Doc. # 202.)

### III.  Class Certification

### A.  Standard Involved

Following the proposal of a properly defined class, a district court addressing class certification must turn to Federal Rule of Civil Procedure 23 to ascertain whether certification is warranted.  Rule 23(a) sets forth the prerequisites to certifying a class under one of the Rule 23(b) provisions, providing:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  A district court must conduct a rigorous analysis of each factor.  *Reeb v. Ohio Dep't of Rehab. and Corr.*, 435 F.3d 639, 644 (6th Cir. 2006) [hereinafter *Reeb II*].

The burden is on the plaintiffs to establish a right to class certification.  *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982); *Alkire v. Irving*, 330 F.3d 802 (6th Cir. 2003).  If plaintiffs satisfy all of the Rule 23(a) prerequisites, they may maintain a class action if they also meet one of the three types of class action suits recognized in Rule 23(b).  Fed. R. Civ. P. 23(b); *Sprague v. General Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998) ("No class that fails to satisfy all four of the prerequisites of Rule 23(a) may be certified, and each class meeting those

12

prerequisites must also pass at least one of the tests set forth in Rule 23(b).").  *See also Reeb II*,

435 F.3d at 645; *Alkire*, 330 F.3d at 820.

> Plaintiffs here seek to proceed under Rule 23(b)(3), which provides:

> [T]he court finds that the questions of law or fact common to the members of the
> class predominate over any questions affecting only individual members, and that
> a class action is superior to other available methods for the fair and efficient
> adjudication of the controversy. The matters pertinent to the findings include: (A)
> the interest of members of the class in individually controlling the prosecution or
> defense of separate actions; (B) the extent and nature of any litigation concerning
> the controversy already commenced by or against members of the class; (C) the
> desirability or undesirability of concentrating the litigation of the claims in the
> particular forum; (D) the difficulties likely to be encountered in the management
> of a class action.

Fed. R. Civ. P. 23(b)(3).  A failure to meet either the Rule 23(b)(3) predominance or superiority

requirements precludes certification under that portion of the rule.  *Amchem Prods., Inc. v.*

*Windsor*, 521 U.S. 591, 615 (1997); *Reeb v. Ohio Dep't of Rehab. and Corr.*, 81 F. App'x 550,

552 n.2 (6th Cir. 2003) [hereinafter *Reeb I*] (quoting *Amchem*, 521 U.S. at 615).

> In addressing the foregoing requirements, a district court cannot inquire into the merits of

the class representatives' underlying claims.  *Reeb I*, 81 F. App'x at 555 (citing *Eisen v. Carlisle*

*& Jacquelin*, 417 U.S. 156, 178 (1974).  Instead, the district court must accept as true the factual

allegations contained within a plaintiff's complaint.  *Id.*  This may or may not be enough to

support certification, however, as the Sixth Circuit has explained:

> Ordinarily, a district court must determine the permissibility of class certification
> based upon information other than that which is in the pleadings although it may
> do so based on the pleadings alone where they set forth sufficient facts.  In
> making such a determination, a district court may draw reasonable inferences
> from the facts before it.

*Id.* at 555 (citations omitted).

> In addition to the foregoing principles, the Court notes that it must also err in favor of

certification when there is some doubt as to whether to certify a class. *Eddleman v. Jefferson County, Ky.*, 96 F.3d 1448, 1996 WL 495013, at *3 (6th Cir. Aug. 29, 1996) (unpublished table decision) ("When evaluating whether to certify the class . . . any doubts as to certification should be resolved in favor of plaintiffs."). This is not a blanket endorsement of certification, however, because at any time before final judgment, a district court has the discretion to modify the certification order and even to decertify the class in light of subsequent litigation developments. Fed. R. Civ. P. 23(c)(1)(C); *Daffin v. Ford Motor Co.*, 458 F.3d 549, 554 (6th Cir. 2006) (citing *Falcon*, 457 U.S. at 160).

Guided by the foregoing principles, the Court shall proceed to examine the proposed class definition and each Rule 23 requirement individually.

### B. Class Definition

A threshold issue that is implicit in a Rule 23 inquiry is that a court conclude that the named plaintiffs seeking certification propose an identifiable, unambiguous class in which they are members. *Foster v. D.B.S. Collection Agency*, No. 01-CV-514, 2002 WL 484500, at *3 (S.D. Ohio Mar. 26, 2002) (citing *Reid v. White Motor Corp.*, 886 F.2d 1462, 1471 (6th Cir. 1989)). Here, Plaintiffs propose the following class definition, which is a reply-memorandum modification[6] of the definition presented in their actual motion:

> All persons located in the United States (excluding Defendants, their parents, predecessors, subsidiaries and affiliates, and co-conspirators), who purchased Foundry Resins directly from Defendants or any of their predecessors, or controlled subsidiaries or affiliates, at any time during the period from January

---

[6] The modification moots some of Defendants' objections to the proposed class because it eliminates points of contention, such as the deleted "from a facility in the United States" language that Defendants cited as a ground to defeat Plaintiffs' meeting the typicality requirement. (Doc. # 179-2, at 57-8.)

14

1, 2001 through December 31, 2003.

> The term Foundry Resins includes resin systems (often including a resin, co-reactant and catalyst) and refractory coatings used in foundries to produce casts and molds to cast metal.

> The term Foundry Resins excludes resin coated sand and liquid and flake shell resins. Additionally, the class claims do not include purchases under written contracts that were entered into before January 1, 2002, continued through December 31, 2003, and provided for changes in prices based solely on changes in cost of materials.

(Doc. # 197-1, at 2.) Plaintiffs have thus satisfied the two threshold conditions implicit in Rule 23.

Plaintiffs have proposed an identifiable and unambiguous class. The proposed definition specifies a particular group that was allegedly harmed: Defendants' non-excluded foundry resins purchasers. The purported harm occurred during a particular time frame, specifically January 1, 2001 through December 31, 2003. The sufficiently narrow definition also includes a particular albeit large location, the United States, and, in light of the complaint allegations, targets the harm occurring in a particular way (i.e., overcharging). It also facilitates this Court's ability to ascertain class membership in an objective manner, by looking at verifiable purchasers and the transaction data.

Plaintiffs are also members of the proposed class. There is in fact little substantive dispute over whether the proposed class representatives are part of the offered class, possess the same interest, and have suffered the same alleged injuries as the putative class members (although there is debate over related individualized damages).

The Court thus concludes that Plaintiffs have adequately presented a properly defined class and that an examination of the Rule 23 requirements is warranted.

15

## C.  Rule 23(a) Requirements

### 1.  Numerosity

A threshold requirement for class certification is that "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  This requirement, termed numerosity, does not mandate a specific minimum number of putative class members.  5 James Wm. Moore et al., *Moore's Federal Practice* § 23.22[1][a], at 23-57 (3d ed. 2006) [hereinafter *Moore's*].  The Sixth Circuit has explained:

> We have observed that "[t]here is no strict numerical test for determining impracticability of joinder."  *In Re American Med. Sys., Inc.,* 75 F.3d at 1079 (citing *Senter v. Gen. Motors Corp.,* 532 F.2d 511, 523 n. 24 (6th Cir.), *cert. denied,* 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976)).  Indeed, "[t]he numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations."  *Gen. Tel. Co. of the Northwest, Inc., v. EEOC,* 446 U.S. 318, 330, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980).  Nevertheless, while "the exact number of class members need not be pleaded or proved, impracticability of joinder must be positively shown, and cannot be speculative."  *McGee v. East Ohio Gas Co.,* 200 F.R.D. 382, 389 (S.D. Ohio 2001) (quotation and citations omitted); *see also* 7A Charles Alan Wright & Arthur R. Miller, Mary Kay Kane, Federal Practice And Procedure § 1762 (3d Ed.2001) (observing that the party seeking class certification "bear[s] the burden of showing impracticability and mere speculation as to the number of parties involved is not sufficient to satisfy Rule 23(a)(1)").

*Golden v. City of Columbus*, 404 F.3d 950, 965-66 (6th Cir. 2005).  Thus, "while there is no strict numerical test, 'substantial' numbers usually satisfy the numerosity requirement."  *Daffin*, 458 F.3d at 552 (holding that thousands of claimants satisfies numerosity requirement).  Although the substantial numbers must be based on more than mere speculation, *Golden*, 404 F.3d at 966, all that is required in a class-certification inquiry is an adequate statement of the basic facts demonstrating that Plaintiffs have met the requirements.  *Reeb I*, 81 F. App'x at 555 (describing facts needed for all Rule 23 requirements).  Provided such adequate facts are before

16

the Court, the "sheer number of potential litigants in a class, especially if it is more than several hundred, can be the only factor needed to satisfy Rule 23(a)(1)." *Bacon v. Honda of America Mfg., Inc.*, 370 F.3d 565, 570 (6th Cir. 2004). *See also In re American Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996) ("When class size reaches substantial proportions . . .the impracticability requirement is usually satisfied by the numbers alone."); *Moore's* § 23.22[1][b], at 23-58 to -59.

Here, the non-speculative information that Plaintiffs have placed before the Court indicates that there were at least 850 direct purchasers of foundry resins during the class period.[7] This alone satisfies the numerosity requirement.[8] *See Bacon*, 370 F.3d at 570 (holding that a

---

[7] Plaintiffs' class expert, John C. Beyer, stated in his affidavit that he reviewed documents and transaction data of Ashland and HAI for June 29, 1998 through December 31, 2004 and April 25, 1998 through April 25, 1998, respectively, as well as numerous other material. (Doc. # 165-4, June 30, 2006 Beyer Aff. ¶ 9, Appx. B.) Based on his survey of this material, Beyer opined:

> The Defendants sold foundry resins or refractory coatings to at least 850 customers in 43 states in the United States during the Class Period. . . . According to Defendants' electronic transaction data, HAI made deliveries of resins to 41 states. HAI sold resins and refractory coatings to 530 customers. Ashland made sales of resins to 39 states and of refractory coatings to 36 states, to a combined 460 customers. Ashland and HAI sold resins to 37 states in common. The geographic market for foundry resins and refractory coatings produced by Defendants is, at least, national in scope. And because Defendants sell to customers throughout the United States, all purchasers would have benefited [*sic*] from enhanced price competition but for the alleged conspiracy.

(Doc. # 165-4, June 30, 2006 Beyer Aff. ¶ 39.)

[8] Defendant did not attack the numerosity requirement in either their briefing (Doc. # 179-1) or at oral argument, instead electing to focus on issues of commonality, typicality, adequacy, predominance, and superiority. This and the factual information before the Court support a finding favoring Plaintiffs on the numerosity requirement. *See In re American Med. Sys., Inc.*, 75 F.3d at 1079-80 (upholding numerosity determination in part because defendant did not contest the factor).

class of 800 satisfies Rule 23(a)(1) because it is "well beyond the point that joinder would be feasible"); *Alkire*, 330 F.3d at 820 (holding the mere speculation that hundreds of class members existed was insufficient for certification when information before the court supported finding of only nine members); *Shellhammer v. Lewallen*, 770 F.2d 167, 1985 WL 13505 (6th Cir. July 31, 1985) (unpublished table decision) (no certification based on putative class of twelve).

In addition to considering sheer numbers in ascertaining whether joinder is impracticable, this Court may also consider " 'judicial economy arising from the avoidance of a multiplicity of actions, geographic dispersion of class members, financial resources of class members, the ability of claimants to institute individual suits, and requests for prospective injunctive relief . . . .' " *Foster*, 2002 WL 484500, at *5 (quoting *Robidoux v. Celani,* 987 F.2d 931, 936 (2d Cir. 1993)). The latter three considerations do not necessarily compel a finding of sufficient numerosity here, but the former two considerations support Plaintiffs here. Because the practical difficulties of separate trials or even joining all putative class members and their respective claims in one proceeding would be unduly expensive, time-consuming, and logistically difficult, the judicial economy benefits of certification support recognizing numerosity in this consolidated proceeding. *See Moore's* § 23.22[1][c], at 23-62; *see also Tomlison v. Kroger Co.*, No. C2-03-706, 2007 WL 1026349, at *2-3 (S.D. Ohio Mar. 30, 2007). Similarly, although the geographic distribution of the potential parties hardly renders joinder impossible, it does render it impracticable and supports concluding that Plaintiffs have satisfied the numerosity requirement. *Id.*, § 23.22[1][d], at 23-62 to 23-63.

### 2. Commonality

Rule 23(a)(2) provides that a class can be certified only if "there are questions of law or

18

fact common to the class." Fed. R. Civ. P. 23(a)(2).  The Sixth Circuit has stated that "[a]lthough

Rule 23(a)(2) speaks of 'questions' in the plural . . . there need only be one question common to

the class." *Sprague v. General Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998).   Not every

common issue will suffice.  *See id.*  Rather, the commonality test is only met when there is at

least one issue whose resolution will advance the litigation by affecting a significant number of

the proposed class.  *Sprague*, 133 F.3d at 397; *see also Fallick v. Nationwide Mut. Ins. Co.*, 162

F.3d 410, 422 (6th Cir. 1998).  Plaintiffs' allegations need not be identical to comport with Rule

23(a)(2).  *Sprague*, 133 F.3d at 397; *In re American Med. Sys.*, 75 F.3d at 1080; *see also In re*

*Workers' Comp.*, 130 F.R.D. 99, 105 (D. Minn 1990.)  Factual differences among Plaintiffs'

claims do not defeat the commonality requirement.  *In re American Med. Sys.*, 75 F.3d at 1080.

Here, Plaintiffs have alleged several questions of law and fact that are common to the

proposed class.  These questions include whether Defendants' alleged conduct violated Section 1

of the Sherman Act, 15 U.S.C. § 1, when Defendants allegedly engaged in a conspiracy to fix,

raise, and maintain the prices of foundry resins and to allocate customers and markets for

foundry resins.  Plaintiffs' claims beg the subsequent question as to whether class members then

suffered the impact of having to pay higher prices for foundry resins than they otherwise would

have but for Defendants' alleged conspiracy.  Insofar as Plaintiffs allege that Defendants

engaged in a price- fixing conspiracy, this Court finds that Plaintiffs' claims satisfy the

commonality requirement of Rule 23(a).  *See, e.g.*, *In Re Potash Antitrust Litig.*, 159 F.R.D. 682,

689 (D. Minn. 1995) (stating that plaintiffs met the commonality requirement when they alleged

that Defendants engaged in a conspiracy to fix wholesale price of potash).  Price-fixing

conspiracy cases by their very nature deal with common legal and factual questions about the

existence, scope, and extent of the alleged conspiracy.  *In re Workers' Compensation*, 130 F.R.D. at 105. Plaintiffs have a shared interest in attempting to prove that Defendants engaged in a conspiracy to fix, raise, and maintain the prices of foundry resins and to allocate customers and markets for foundry resins.  Without proof of these common questions of law and fact, none of Plaintiffs recover.  Thus, Plaintiffs here satisfy the commonality requirement of Rule 23(a)(2) because resolution of their common conspiratorial allegations will advance this litigation.  *See, e.g., Sprague*, 133 F.3d at 397.

### 3. Typicality

This Court also concludes that Plaintiffs' allegations are sufficient to satisfy the typicality requirement of Rule 23(a)(3).  Pursuant to this requirement, a court will not certify a putative class unless "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  A plaintiff's claim is considered "typical" if it arises from the same course of conduct that gives rise to the claims of the other class members, or if it is based on the same legal theory.  *In re Workers' Comp.*, 130 F.R.D. at 105; *see also J.B.D.L. Corp. v. Wyeth-Ayerst Labs. Inc.*, 225 F.R.D. 208, 214 (S.D. Ohio 2003).

Here, Defendants challenge the typicality of Plaintiffs' claims.  Defendants posit that the class representatives are "so diverse or idiosyncratic that they cannot properly represent the various class members."  (Doc. # 179.)  Specifically, Defendants argue that the named Plaintiffs' purchasing practices are atypical of one another and of the class.  Defendants offer several examples to illustrate the diversity of the named plaintiffs' purchasing practices.  Defendants claim that the named plaintiffs bought in different quantities by different methods.  Some Plaintiffs purchased on a "spot basis" while others attempted to negotiate or bargain, and some

Plaintiffs purchased under long-term contracts subject to discounts or limited price adjustments while others did not obtain such concessions. Defendants contend that each plaintiff's unique circumstances preclude this Court from finding typicality.

Conversely, Plaintiffs argue that their claims are typical of those of the class because each company is a direct purchaser of foundry resins, and each alleges that it was forced to pay supra-competitive prices for its purchases as a result of Defendants' alleged conspiracy. Plaintiffs further contend that the named plaintiffs need to prove the same elements as absent class members: the existence, the scope, and the efficacy of the conspiracy. This Court finds Plaintiffs' arguments more convincing.

Courts liberally construe the typicality requirement. *See, e.g.*, *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 164 (C.D. Cal. 2002). In the antitrust context, typicality is established when the named plaintiffs and all class members alleged the same antitrust violations by defendants. *Id.* Specifically, named plaintiffs' claims are typical in that they must prove a conspiracy, its effectuation, and damages therefrom–precisely what the absent class members must prove to recover. *In re Potash Antitrust Litig.*, 159 F.R.D. at 691; *see also In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D.180, 185 (D.N.J. 2003) (finding that plaintiffs met the typicality requirement solely based on the fact that plaintiffs' main claim–that they were harmed by an illegal price-fixing conspiracy–was the same for all class members), *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 480 (W.D. Pa. 1999) (finding that defendants' alleged price-fixing conspiracy was an appropriate basis for a finding of typicality); *In re Catfish Antitrust Litig.*, 826 F. Supp. 1019, 1035 (N.D. Miss. 1993) (finding that "wherein it is alleged that the defendants engaged in a common scheme relative to

21

all members of the class, there is a strong assumption that the claims of the representative parties

will be typical of the absent class members").

Contrary to Defendants' position, if the named class members' claims are based on the

same legal theory or arise from the same course of conduct by Defendants, the specific

circumstances leading to each class member's injuries are of little relevance to the typicality

inquiry. *See, e.g., Bentley v. Honeywell Int'l, Inc*., 223 F.R.D. 471, 482 (S.D. Ohio 2004); *Baby*

*Neal v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994) (stating that where there is strong similarity of legal

theories, even relatively pronounced factual differences generally do not preclude a finding of

typicality).

Thus, if the named class members' claims are based on the same legal theory or arise

from the same course of conduct, factual differences in date, size, manner, or conditions of

purchase, the type of purchaser, or other such concerns do not make named plaintiffs atypical. *In*

*re Lorazepam & Clorazepate Antitrust Litig.,* 202 F.R.D. 12, 28 (D.D.C. 2001) (stating "[t]he

overarching scheme is the linchpin . . . regardless of the product purchased, the market involved,

or the price ultimately paid"); *Thomas & Thomas Rodmakers, Inc.*, 209 F.R.D. at 165 (stating

that the typicality requirement does not mandate that products purchased or methods of purchase

of the named plaintiffs be the same as those of absent class members provided that the cause of

action arises from a common wrong) *United Nat'l Records, Inc., v. MCA, Inc.,* 99 F.R.D. 178,

181 (N.D. Ill. 1983) (finding that typicality does not require that all purchasers have identical

pricing structures). Moreover, differing damages, as a result of varied methods of procuring and

purchasing the product, will not prevent a court from finding typicality. *In re Potash Antitrust*

*Litig*., 159 F.R.D. at 691, *In Re Flat Glass Antitrust Litig*., 191 F.R.D. at 480 ("the various

products purchased and the different amount of damage sustained by individual plaintiffs do not

negate a finding of typicality, provided the cause of action arises from a common wrong"); *see*

*also J.B.D.L. Corp.*, 225 F.R.D. at 216 (stating that "[a]ntitrust injury is considered complete

when the direct purchaser pays an illegal overcharge and whether he was able to pass through the

overcharge to indirect purchasers is irrelevant to the inquiry . . . [even if some] of the direct

purchaser were able to recoup the overcharge through prices increases passed on to other

purchasers").

  This Court concludes that Defendants' arguments are not persuasive.  Here, Plaintiffs

have alleged an antitrust price-fixing and market-allocation scheme whereby Defendants

allegedly engaged in a conspiracy to fix, raise, and maintain the prices of foundry resins and to

allocate customers and markets for foundry resins.  The claims asserted on behalf of the putative

class involve the same legal theory–violation of Section 1 of the Sherman Act– and involve the

same elements of proof in relation to the existence, scope, duration and success of the alleged

conspiracy.  Defendants' contentions that Plaintiffs may have had diverse purchasing practices

and circumstances do not defeat a finding of typicality.  Thus, Plaintiffs' allegations are

sufficient to satisfy the typicality requirement of Rule 23(a)(3).

### 4. *Adequacy of Representation and Appointment of Class Counsel*

  The final requirement of Rule 23(a) mandates that the Court examine the adequacy of the

class representative.  The representative parties must "fairly and adequately protect the interests

of the class."  Fed. R. Civ. P. 23(a)(4).  The adequacy of representation requirement is designed

to protect class members who are not named as parties to the action but nevertheless who will be

bound by a subsequent judgment.  *Hansberry v. Lee*, 311 U.S. 32, 45 (1940).  *See also Smith v.*

*Babcock*, 19 F.3d 257, 265 n.13 (6th Cir. 1994) (holding that "[n]o class should be certified where the interests of the members are antagonistic, because the preclusive effect of the verdict may deprive unnamed class members of their right to be heard"); *Ballan v. Upjohn Co.*, 159 F.R.D. 473, 482 (W.D. Mich. 1994) (finding that because of the binding effect of judgment on absent class members, adequacy of representation is crucial).

The Sixth Circuit has articulated two criteria for determining adequacy of representation: "1) [t]he representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Senter v. General Motors Corp.*, 532 F.2d 511, 525 (6th Cir.), *cert. denied*, 429 U.S. 870 (1976).  There can be no conflict between the named plaintiffs and other members of the class, and the named plaintiffs must be able to fulfill their various duties.

Plaintiffs predictably argue that they meet the Rule 23(a)(4) requirements.  They submit that there are no conflicts between them and the class because Plaintiffs and the class all purchased foundry resins from Defendants, that they have the same interest in establishing liability, and that they all seek damages for overpayment.  Plaintiffs further assert that the class representatives stand ready, willing, and able to manage and prosecute this matter.

Defendants attack the class representatives as being ill-prepared to serve the class because of their lack of knowledge of the facts of the case and the nature of the class action interests they seek to represent.  Defendants' position is that the lawsuit is being driven by the interests of the attorneys rather than the interests of the class representatives.

Defendants do not argue, however, that conflicts exist between the interests of the class representatives and the class.  Indeed, this Court finds that the interests of the class

24

representatives are not antagonistic to those of the class.  The only seriously contested issue is whether the class representatives will present a vigorous prosecution of the litigation.  This Court finds Defendants' argument lacking in substance when examined in light of applicable case law.  Plaintiffs have not delayed the progress of this case to date and, in fact, have exhibited no reluctance in the prosecution of the matter.  The fact that certain deponents of the class representatives did not have a complete grasp of the law or of all the facts of this enormous litigation is not surprising to the Court and does little to convince this Court that the class representatives are inadequate.

Although it is true that a class representative must possess at least a minimal degree of knowledge regarding the case, it is not necessary that the class representative be so knowledgeable as to be able to assist counsel with the legal aspects in such a complex case.  Adequacy of representation does not require an antitrust litigant to appreciate the finer points of the Sherman Act or the Federal Rules of Civil Procedure.  *See In re Catfish Antitrust Litig.*, 826 F. Supp. at 1037.  As noted in Plaintiffs' reply memorandum, another district court has aptly stated:

> [I]t strikes us as at least partially unrealistic to expect the named plaintiffs to have any significant personal knowledge of the facts in a case like this, involving an antitrust conspiracy.  This is something which, if it can be established, will only be done after a great deal of investigation and discovery by counsel against a background of legal knowledge.  To require the class representative to be sophisticated and knowledgeable enough to help counsel in this quest would reduce the class action device, especially in complicated antitrust cases, to an impotent tool.

*Chevalier v. Baird Sav. Ass'n*, 72 F.R.D. 140, 146 (E.D. Pa. 1976) (citations omitted).  This Court agrees with the *Chevalier* rationale and finds that Plaintiffs have satisfied the adequacy requirement.

25

The appointment of class counsel is a separate consideration, although it has traditionally been considered as an element of the adequacy inquiry. The reason for the blurring of the two issues, perhaps, is that until December 2003 courts scrutinized proposed class counsel under Rule 23(a)(4). But with the enactment of Rule 23(g), this Court must specifically approve and appoint class counsel under a more specific inquiry. The nearly three-and-one-half year old Rule 23(g)(1) provides:

> (A) Unless a statute provides otherwise, a court that certifies a class must appoint class counsel.
> (B) An attorney appointed to serve as class counsel must fairly and adequately represent the interests of the class.
> (C) In appointing class counsel, the court
> > (i) must consider:
> > • the work counsel has done in identifying or investigating potential claims in the action,
> > • counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action,
> > • counsel's knowledge of the applicable law, and
> > • the resources counsel will commit to representing the class;
> > (ii) may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class;
> > (iii) may direct potential class counsel to provide information on any subject pertinent to the appointment and to propose terms for attorney fees and nontaxable costs; and
> > (iv) may make further orders in connection with the appointment.

Fed. R. Civ. P. 23(g)(1). Having reviewed the foregoing requirements, the Court finds that class counsel can fairly and adequately represent the interests of the class.

It is undisputed that interim counsel have diligently worked to identify and investigate the potential claims in this matter. Interim counsel have shown a willingness to prosecute the case, which has already involved time-consuming discovery. Their extensive collective experience has not been challenged by Defendants. Moreover, interim counsel have declared that they are prepared to dedicate the resources necessary to litigating this case. This Court also

26

finds that both Plaintiffs' counsel and counsel for Defendants have exhibited an exemplary knowledge of the applicable law. Finally, although Plaintiffs' counsel seek the appointment of four law firms as class counsel, the Court recognizes the need for adequate staffing of the case. The Court is confident that counsel will neither overstaff the case nor adopt an ungainly counsel structure, either of which would cause the Court to revisit its analysis.

Accordingly, the previously appointed interim counsel are approved and appointed as class counsel in this matter.

### D. Rule 23(b) Requirements

#### 1. Predominance

"A claim will meet the predominance requirement when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individualized position." *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 307 (E.D. Mich. 2001). Common questions need only predominate; they need not be dispositive of the litigation. *See, e.g, In re Potash Antitrust Litig.*, 159 F.R.D. at 693. The existence of individual issues, therefore, do not defeat class certification. *In re Mercedes-Benz Antitrust Litig.,* 213 F.R.D. at 186.

A mere allegation of price-fixing will not satisfy the predominance requirement of Rule 23(b). As a general rule in antitrust price-fixing cases, however, courts have consistently found that common issues regarding the existence and scope of the conspiracy predominate over questions affecting only individual members. *See, e.g.*, *In re Catfish Antitrust Litig.*, 826 F. Supp. at 1039 ("As a rule of thumb, a price fixing antitrust conspiracy model is generally regarded as well suited for class treatment"); *see also In re Infant Formula Antitrust Litig.*, MDL

No. 878, 1992 WL 503465, at *6 (N.D. Fla. Jan. 13, 1992) ("Where a horizontal price-fixing conspiracy is alleged, the questions common to the class predominate over questions that may affect only individual class members.")

In light of this presumption, a court must evaluate the substantive allegations in a plaintiffs' complaint to determine whether common questions of law or fact predominate. *In re Potash Antitrust Litig.*, 159 F.R.D. at 693. In this case, Plaintiffs have alleged that Defendants conspired to fix, raise, and maintain the prices of foundry resins as well as to allocate customers and markets for foundry resins. To prevail on their price-fixing claims, Plaintiffs must demonstrate (1) a violation of the anti-trust law, (2) direct injury (or impact) from the violation, and (3) damages. *See, e.g., In re Potash Antitrust Litig.*, 159 F.R.D. at 693.

Defendants claim that undisputed facts preclude Plaintiffs from proving impact on every class member through common proof. Specifically, Defendants contend that factors such as individualized pricing negotiations, the existence of purchasing contracts, the presence of large buyers, a wide diversity of resins and coating products, and market competition between the Defendants themselves, serve as a barrier to Plaintiffs proving impact through common proof. Rather, Defendants argue, Plaintiffs can only prove impact–paying an alleged price increase–by engaging in individual analysis of each member's transactions. Thus, according to Defendants, there is no class-wide mechanism to calculate damages. This Court will evaluate Defendants' contentions as they pertain to the requisite elements that Plaintiffs must establish in order to pursue their antitrust claim.

Plaintiffs allege that Defendants engaged in a horizontal price-fixing and market-allocation conspiracy to violate antitrust laws. It is well settled that "[p]rice-fixing is illegal *per*

*se* under the Sherman Act, 15 U.S.C. § 1." *In re Potash Antitrust Litig*., 159 F.R.D. at 694

(citing *Citizen Publ'g Co. v. United States*, 394 U.S. 131, 135 (1969)).  The Sixth Circuit has

stated:

> [W]hen a restraint is found to be proscribed *per se*, the plaintiff need
> only prove that (1) two more entities engaged in a conspiracy,
> combination, or contract, (2) to effect a restraint or combination prohibited
> *per se* (wherein the anticompetitive effects within a relevant geographic
> and product market are implied), [and] (3) that was the proximate cause of the
> plaintiff's antitrust injury.

*Expert Masonry, Inc. v. Boone County, Ky.,* 440 F.3d 336, 342 (6th Cir. 2006) (citations

omitted).

Thus, Plaintiffs' allegations establish a *per se* violation of antitrust laws.  *See, e.g., In re*

*Cardizem CD Antitrust Litig.,* 332 F.3d 896, 907 (6th Cir. 2003) (" 'Certain agreements, such as

horizontal price fixing and market allocation, are thought so inherently anticompetitive that each

is illegal *per se* without inquiry into the harm it has actually caused' ") (quoting *Copperweld*

*Corp. v. Independence Tube Corp*., 467 U.S. 752, 768 (1984)).

Defendants also argue that Plaintiffs cannot show impact through common proof.

Rather, Defendants contend that proof of antitrust injury on every class member would require

this Court to engage in a series of mini-trials to determine whether each member of the class

suffered some or all of the alleged price increases.  This Court is not persuaded.

Where, as here, Plaintiffs have alleged a conspiracy to fix-prices and allocate markets,

courts have presumed class-wide impact.  *See, e.g., In re Carbon Black Antitrust Litig.*, No.

Civ.A. 03-10191-DPW, MDL No. 1543, 2005 WL 102966, at *15 (D. Mass. Jan. 18, 2005).

Courts have generally found that when parties succeed in conspiring to fix prices, everyone who

purchases the relevant goods or services are invariably injured.  *Id.* at *15; *In re Catfish Antitrust*

29

*Litig.*, 826 F. Supp. at 1041 (stating that in price-fixing cases, "there is a presumption that all purchasers will be impacted/injured by having to pay the higher price"); *In re Potash Antitrust Litig.*, 159 F.R.D. at 695 (stating that "because the gravamen of a price-fixing claim is that the price in a given market is artificially high, there is a presumption that an illegal price-fixing scheme impacts upon all purchasers of a price-fixed product in a conspiratorially affected market").

As Plaintiffs correctly mention, they do not merely rely on their allegations of price-fixing to make a threshold showing of impact.  Rather, Plaintiffs' proffer analysis of antitrust economist Beyer to support their argument that impact can be shown on every class member by common proof.  Beyer performed a standard economic investigation and analysis of the structural characteristics of the foundry resins industry.   First, Beyer concluded that demand-side substitution, otherwise known as product interchangeability, exists in the industry.  This means that foundry resins and refactory coatings are each undifferentiated, commodity-like products that allow customers to make their purchasing decisions primarily on price.  Thus, because of the similarities between products, supply-side substitution also exists as manufacturers have the capacity to produce and sell one anothers' products.  Second, there is a national market for this industry allowing Defendants to sell or have the capacity to sell across the United States.   Third, Defendants jointly had market power derived from four characteristics of the industry: (1) Defendants jointly controlled a significant portion of United States production capacity and were responsible for a significant portion of sales; (2) there were substantial barriers deterring potential entrants into the industry in the United States; (3) there were no close economic substitutes; (4) the demand for foundry resins have been price elastic.

The structural characteristics of the industry appear to create a market that is susceptible to price-fixing.  Moreover, these market traits imply that, absent a conspiracy, Plaintiffs would have been able to benefit from competition and switch between suppliers to avoid paying higher prices.  These structural characteristics may serve as common proof that Defendants' alleged conspiracy to fix prices in such a market impacted all purchases.  Thus, a reasonable juror could find that every class member suffered the impact of higher prices as a result of Defendants' unlawful conduct without being required to engage in an individual inquiry.

For purposes of class certification, this Court need not entertain Defendants' arguments that essentially question whether Plaintiffs' expert is correct in his assessment of these market characteristics as to whether they do, in fact, show that every plaintiff suffered a common impact.  Rather, this is for the trier of fact to later decide.  *In re Catfish Antitrust Litig*., 826 F. Supp. at 1042.  In considering a class certification motion, a court must not decide the merits but instead must consider only whether plaintiffs have made a threshold showing "that what proof they will offer will be sufficiently generalized in nature that . . . the class action will provide a tremendous savings of time and effort."  *In re Potash Antitrust Litig*., 159 F.R.D. at 697.  This Court is satisfied that this case is favorably comparable to the litany of antitrust price-fixing cases that have also rejected the argument that diverse purchasing practices prevent a showing of common impact.

This leaves the issue of damages.  At the class certification stage, antitrust plaintiffs have a limited burden with respect to showing that generalized proof of damages predominates over individual damages.  *See, e.g.*, *In re Potash Antitrust Litig*., 159 F.R.D. at 697 (stating that "[a]ntitrust plaintiffs have a limited burden with respect to showing that individual damages

31

issues do not predominate"); *see Texaco Inc. v. Hasbrouck*, 496 U.S. 543, 573 (1990).  Plaintiffs

do not need to supply a precise damages formula at this stage of a antitrust action.  *See, e.g., In

re Potash Antitrust Litig.*, 159 F.R.D. at 697.  The court's inquiry is limited to whether the

proposed methods are so insubstantial as to amount to no method at all.  *Id.*  Thus, plaintiffs meet

their burden if they show that they can use recognized and reliable methodologies to prove

damages on a class-wide basis.  *In re Carbon Black Antitrust Litig.*, 2005 WL 102966, at *19-20.

This relaxed standard stems from the equitable notion that the wrongdoer should not be able to

profit by insistence on an unattainable standard of proof.  *In re Potash Antitrust Litig.*, 159

F.R.D. at 697 (citing *In re Catfish Antitrust Litig.*, 826 F. Supp. at 1042-43).

      Moreover, when a court can determine liability on a class-wide basis, the fact that the

damages calculation may involve individualized analysis is not by itself sufficient to preclude

certification in an antitrust action.  *Id.  See Odlen v. Lafarge Corp.*, 383 F.3d 495, 509 (6th Cir.

2004) (stating that a Court may certify a class even if some individual questions remain as to

damages, because a court can bifurcate the issue of liability from the issues of damages); *In re

Workers' Comp.*, 130 F.R.D. at 110 (stating that "[i]ndividual questions of damages are often a

problem encountered in an antitrust action and are rarely a barrier to certification") (citing

*Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 456 (3d Cir. 1977)).

      Here, Plaintiffs have proffered several reasonable damage methodologies.  Specifically,

Beyer has identified two possible damages methodologies that he concludes can be performed to

calculate damages in this case on a class-wide basis. (Doc. # 165-4, June 30, 2006 Beyer Aff. ¶¶

61-69.)  First, through a benchmark or yardstick approach, Beyer can determine the alleged

overcharge by comparing the difference of prices during the benchmark period to those during

the period of the alleged conspiracy.  *Id.*  Second, Beyer states that he has adequate information

available to allow him to employ a multiple regression analysis.  *Id.*  Through a multiple

regression analysis, Beyer will construct an appropriate model using factors that affect prices

such as supply and demand.  *Id.*  These methods are not so insubstantial as to amount to no

method at all.  Rather, courts have recognized that these economic analyses are acceptable,

generalized methods for assessing damages on a class-wide basis.  *See, e.g., In Re Linerboard*

*Antitrust Litig.*, 203 F.R.D. 197, 220 (E.D. Pa. 2001), *aff'd* 305 F.3d 145 (3d Cir. 2002); *In re*

*Carbon Black Antitrust Litig.*, 2005 WL 102966, at *19-20.

 Thus, this Court finds that Plaintiffs have sufficiently demonstrated that common issues

relating to Defendants' liability–the existence, scope, and extent of the alleged

conspiracy–predominate over potential individual damage issues.

 Moreover, even if damage assessments end up being too individualized to resolve as a

class, that does not warrant denial of Plaintiffs' certification at this stage.  *In re Carbon Black*

*Antitrust Litig.*, 2005 WL 102966, at *19-20; *see also In re Potash Antitrust Litig.*, 159 F.R.D. at

698.  If the damage calculations end up not lending themselves to class-wide resolution,

appropriate alternatives exist.  First, the Court can sever the question of damages from that of

liability.  *In re Carbon Black Antitrust Litig.*, 2005 WL 102966, at *19-20; *In re Potash Antitrust*

*Litig.*, 159 F.R.D. at 698.  After the liability phase, the Court can alter the class–by breaking it

down into subclasses or by decertifying it, for example–and try damages on an individual basis.

*In re Carbon Black Antitrust Litig.*, 2005 WL 102966, at *20; *In re Potash Antitrust Litig.*, 159

F.R.D. at 698.  Allowing bifurcated liability and damages proceedings promotes judicial

economy.  As a result of bifurcation, the Court would try the main issue only once, rather than

for each class member, and damage claims only need to be determined in the event that liability is found.  *In re Carbon Black Antitrust Litig.*, 2005 WL 102966, at *20; *In re Potash Antitrust Litig.*, 159 F.R.D. at 698; *see also* Fed. R. Civ. P. 23(b)(3) advisory committee's notes to 1966 Amendments ("[A] fraud perpetuated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determinations of the damages suffered by individuals within the class.").

For the foregoing reasons, this Court finds that Plaintiffs have presented a sufficient factual and legal basis to meet the predominance requirement.

### 2. *Superiority*

Rule 23(b)(3) also requires the Court to find that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  In considering whether a class action is the superior method to employ, a court should consider:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D).

Having found that common issues of law and fact predominate over individual ones, this Court also finds that a class action is superior to separate trials.  A class action is the most efficient and convenient method to resolve this controversy.  Repeatedly litigating the same issues in individual suits would produce duplicate efforts, unnecessarily increase litigation costs,

impose an unwarranted burden on this Court and other courts, and create a risk of inconsistent results.  *In re Potash Antitrust Litig.*, 159 F.R.D. at 699; *In re Cardizem CD Antitrust Litig.* 200 F.R.D. at 325-26 (finding that class action is superior because it ensures fair and efficient adjudication); *In re Carbon Black Antitrust Litig.*, 2005 WL 102966, at *22 (stating that "[a]ntitrust cases are expensive endeavors and joining forces with other similarly situated plaintiffs is often the only way to effectuate a case.").  Finally, given the cost and complexity of antitrust litigation, claimants with potentially small claim amounts may abandon otherwise valid claims.

Contrary to Defendants' arguments, this Court is also mindful of the presumption against courts dismissing actions for management reasons.  *See, e.g., In re Potash Antitrust Litig.*, 159 F.R.D. at 698.  Although this case might prove to be complex, this Court is convinced, in light of the counsel on both sides' exhibited professionalism and the management methods available to this Court, that resolution of this controversy is manageable.  In the event that the class action later proves to be inappropriate, this Court will exercise its discretionary powers pursuant to Rule 23(c)(1)(C) and adjust this order accordingly.

### IV.  Conclusion

For the foregoing reasons, the Court in its discretion **DENIES AS MOOT** Plaintiffs' motion to strike (Doc. # 207), **DENIES** Defendants' motion to strike (Doc. # 202), and **GRANTS** Plaintiffs' motion to certify class and for appointment of class counsel (Doc. # 165) as amended by the class certification reply memorandum.  The Court therefore **ORDERS**:

(1) The following class is certified:

All persons located in the United States (excluding Defendants, their parents,  predecessors, subsidiaries and affiliates, and co-conspirators), who

35

purchased foundry resins directly from Defendants or any of their predecessors, or controlled subsidiaries or affiliates, at any time during the period from January 1, 2001 through December 31, 2003.

The term "foundry resins" includes resin systems (often including a resin, co-reactant and catalyst) and refractory coatings used in foundries to produce casts and molds to cast metal.

The term "foundry resins" excludes resin coated sand and liquid and flake shell resins. Additionally, the class claims do not include purchases under written contracts that were entered into before January 1, 2002, continued through December 31, 2003, and provided for changes in prices based solely on changes in cost of materials.

(2) The following entities are certified as class representatives: Plaintiffs Amite Foundry & Machine, Inc.; Atchison Casting Corp.; Kore Mart, Ltd.; Kulp Foundry, Inc.; Lancaster Foundry Supply Company; State Line Foundries, Inc.; and Tri-Cast Limited Partnership.

(3) The following counsel are appointed as class counsel: Cohen, Milstein, Hausfeld & Toll P.L.L.C.; Labaton Sucharow & Rudoff LLP; Levin, Fishbein, Sedran & Berman; and Preti, Flaherty, Beliveau & Pachios LLP. The designated liaison counsel remain the same.

(4) The Court will schedule a conference to discuss fee arrangements and nontaxable costs with the class counsel, but the Court declines to impose a fee reporting requirement at this time. *See* Fed. R. Civ. P. 23(g)(2)(C).

At any time before final judgment, the Court shall modify this certification order or even decertify the class should subsequent circumstances warrant such action.

**IT IS SO ORDERED.**

  /s/  Gregory L. Frost
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE